146 A.2d 801 (1958)
Fred J. SCHWARTZ, Plaintiff,
v.
Henry C. MINER, Jr., Leslie R. Schwartz, Samuel Goodman, Andrew A. Nelson, James P. McAllister, Martin H. Newman, Frank Milton, and Harold S. Miner, Benjamin D. Gladstone, Joseph M. Geoghan, Ralph Lager, Harold H. Newman, Walter Dunn, Irving L. Eisenstat, Leon Greenberg, William H. Applegate, Jack R. Weinstein, Charles Call, Allen Grant, and Century Circuit, Inc., a New York corporation, and Combined Century Theatres, Inc., a Delaware corporation, and Twain Realty Corporation, a New York corporation, and Conwall Realty Corporation, a New York corporation, and Century Circuit, Inc., a Delaware corporation, Defendants.
18TH STREET REALTY CORPORATION, a New York corporation, Grupenel Realty Corporation, a New York corporation, Queens Park Operating Corporation, a New York corporation, and Huntstay Operating Corporation, a New York corporation, Plaintiffs,
v.
Fred J. SCHWARTZ, Defendant.
Court of Chancery of Delaware, New Castle.
December 10, 1958.
*802 Arthur G. Logan, of Logan, Marvel, Boggs & Theisen, Wilmington, for plaintiff in Civil Action No. 818 and defendant in Civil Action No. 829.
S. Samuel Arsht and Harvey S. Kronfeld, of Morris, Nichols, Arsht & Tunnell, Wilmington, and B. B. Fensterstock and Israel Akselrod, of Zalkin & Cohen, New York City, for defendants in Civil Action No. 818, except Harold S. Miner, as to whom the action was dismissed for lack of jurisdiction, and for plaintiffs in Civil Action No. 829.
SEITZ, Chancellor.
Plaintiff is a stockholder of Century Circuit, Inc. ("Century"). He filed this action against Century, four of its wholly owned subsidiaries, their directors and eleven key employees and one other subsidiary known as Century Circuit Inc., a New York corporation.
The complaint contains three counts. The first count seeks cancellation of stock options granted to certain employees and the stock issued to them pursuant to their exercise thereof. The second count seeks an accounting from the director-defendants for a portion of the amount of the contribution to the profit sharing trust. The third count seeks an accounting in connection with the sale by Century of certain debentures to the profit sharing trust fund.
Century and certain of the other defendants filed a counterclaim against plaintiff and also filed a separate action against plaintiff seeking a declaratory judgment that plaintiff breached certain of his fiduciary obligations to the counterclaimant under agreements providing that he was to receive certain salaries from each of them for the right to call on him for a certain period of time. By their counterclaim and independent action, defendants sought to recover all salaries paid plaintiff after the date of plaintiff's alleged breach of obligation. Finally, plaintiff sought to recover the unpaid balance of the salary allegedly due him under the above mentioned agreement. No jurisdictional question was briefed. The two actions were consolidated for trial purposes.
This is the decision after final hearing. For simplicity I shall refer to Fred Schwartz throughout as "plaintiff" and to the opposing parties as "defendants".
The thrust of plaintiff's first cause of action is that certain of the individual defendants conspired to assure themselves voting control of Century by a series of transactions over a period of almost two years. The approach to these matters can best be understood by a chronological statement of the history of the Schwartz family since essentially this has become a dispute *803 between plaintiff and his brothers, Leslie and Frank.
Century was organized in 1928. Through subsidiaries it operates motion picture theatres in New York. Many of these subsidiaries were organized long before 1928. The capital structure of Century consists of debentures, preferred and common stock which are traded on the New York over-the-counter market. Many of the present director-defendants are successors to the stock interest of parents who were associated with plaintiff's father in the period when the enterprise was being put together. Thus, the defendant, Henry C. Miner, Jr., owns 13,660 shares of Century common, or about 10% thereof. He also owns substantial amounts of debentures apart from his interest as trustee and income beneficiary of his mother's estate. He has been a director since 1942 and chairman of the board since January 1955.
The defendant Leslie Schwartz, plaintiff's brother ("Leslie"), owns about 16,000 shares (about 12½%) of the common stock and a substantial amount of debentures, in addition to a one-third remainder interest in three trusts ("Schwartz Trusts") which hold a total of 17,946 shares (about 14%) of common stock and a substantial number of debentures. Members of Leslie's immediate family (excluding his brother) own additional amounts of debentures. Leslie has been employed by Century for about twenty years. He has been a director for eight years and president since March 2, 1955.
Frank Milton ("Frank"), who changed his name, is also a brother of Fred and Leslie. He owns 11,847 shares (about 9%) of the common stock and a substantial amount of debentures as well as a one-third remainder interest in the Schwartz Trusts. He has been a director since January 1955.
The defendant McAllister owns about 1,500 or 1,600 shares of common stock and members of his family own approximately 5,000 more shares. He or his family own a substantial amount of preferred stock and debentures. He has been a director for about eight years.
The defendant Nelson owns 3,200 shares (about 2½%) and a substantial number of debentures. In May 1958, he resigned as director and sold his stock and debentures to the company for $160,000.
Defendant Newman owns about 1,500 shares of common stock and a small number of debentures. He has held various executive offices in Century since 1936 and has been a director since June 1955.
Defendant Goodman owns a substantial amount of common stock and debentures. He has been an employee since 1923 and first vice-president since 1955. He has been a director for about four or five years.
The plaintiff became president of Century in 1953 and continued as such until his resignation on March 2, 1955. In the spring of 1954 Distributors Corporation of America ("D. C. A.") was organized for the purposes of financing the production and distribution of motion pictures. Century initially invested $505,000 in its common and preferred stock and thereafter increased its investment to about 60% of the common and preferred by increasing its investment to $623,708.
D. C. A. was in financial troubles from the outset and by February 1955 its condition had become serious. At a board meeting held on February 11, 1955, it was decided that Fred should step out as president of Century and devote himself entirely to D. C. A. and that his brother Leslie should become the president of Century.
Plaintiff was given the opportunity to resign, which he did in a few days. It was arranged that he was to receive over a three year period from March 2, 1955 (1) severance pay of $30,000 each year and (2) an annual salary payable in installments equal to the difference between his then salary and the severance pay, less any compensation he might receive from D. C. A. He was also to continue as a *804 director of Century and to be included in the management's slate at the June 1955 annual meeting. It is fair to say that the parting was not a happy one. In any event, while he was re-elected a director of Century in June, he resigned in March 1956. At that time he purchased a substantial portion of D. C. A.'s stock held by Century.
While the ultimate relief requested under the first cause of action is a cancellation of the options and of the stock issued pursuant thereto to certain employees, the plaintiff's basic contention is that commencing about May 1955, the Century board (without plaintiff's knowledge) commenced to purchase stock in order to assure itself absolute voting control of Century. Plaintiff says that the available stock was so limited that even the purchases made did not assure them of such control and that in order to make absolutely sure that they had mathematical control they adopted the stock option plan device on the assumption that the optionees would vote their shares with the existing management.
Plaintiff, to support his claim, engages in an elaborate tracing of stock holdings by the various directors over a period of time commencing in early 1955. Since his claim is primarily directed at the cancellation of the stock option plan I think it appropriate to turn to it.
Plaintiff alleges that the stock option plan adopted by Century in the latter part of 1956 was part of a conspiracy of the board of directors to perpetuate control of Century in themselves. The plan authorized options covering 12,936 shares; one-half could be purchased on or before February 1, 1957 and the balance only when those shares were paid for. It was to be sold at 95% of market value. At the time there were about 120,000 shares outstanding. The plant had as proposed optionees the defendant-directors Goodman and Newman (who each could obtain up to 4,152 shares), plus eleven department heads or district managers. Neither Goodman nor Newman participated in the board action adopting the plan which was later given stockholder approval.
The plan contemplated the issuance of options to the thirteen individuals on a two stage basis, extending over a period of several years. In return for the grant of the options the optionees were required to sign an employment agreement for a two year period.
While the optionees Goodman and Newman were directors and stockholders I do not consider that they were in the inner circle of the Leslie faction, and it is this faction which is charged by plaintiff with the intention to perpetuate itself. These men had been with Century for many years and all of the optionees were employees of Century at the time when plaintiff was president.
There was no direct evidence that any of the optionees was a party to an alleged conspiracy. The uncontradicted testimony of the optionees was to the effect that no one connected with Century or otherwise ever asked for any commitment to vote the stock in a particular way, and that no such commitment was ever given.
Plaintiff says that the optionees were selected by Leslie in 1956 and that they joined in the conspiracy. Plaintiff supports this assertion by saying that the optionees did not have to accept the options granted to them under the plan, and yet they did so to a large extent. I fail to see how the fact that the optionees exercised the available portions of their options in large part tends to prove that they were parties to a conspiracy of the type alleged. After all, even under plaintiff's contentions, the terms of the options were highly advantageous to the optionees.
Plaintiff also suggests as evidence of the conspiracy the fact that the optionees voted their stock in favor of the management slate at the 1957 annual meeting. *805 How this can have any particular value it is difficult to see in view of the fact that there was no slate other than the management slate put up for the election at that meeting.
The court recognizes that a stock option plan might conceivably be created for the purpose of preserving control. But it would seem that where, as here, the optionees are not in control of the corporation or in working control of the stock, the person charging them with being participants in such a conspiracy has the burden of so proving. I recognize that the proof must of necessity be circumstantial. But here plaintiff shows in substance only that the optionees exercised admittedly valuable option rights. He concedes in effect that all of them hold positions of a character which would normally qualify them as optionees under plans of this type. Plaintiff did not attempt to prove that any aspect of the plan was not supported by adequate consideration.
I note that the number of shares subject to the option plan was not sufficient to be considered disproportionately large. It is of some significance that not all of the first options were exercised. Surely if management wanted to assure mathematical control in the manner alleged it would have seen that all options were exercised.
In view of the status of the employees and the other factors discussed I do not believe plaintiff's circumstantial evidence is strong enough to justify the conclusion that the optionees were parties to the conspiracy alleged. As to the only relief point briefed I therefore conclude that the plaintiff's request for an injunction cancelling the options and any shares issued pursuant thereto must be denied. This conclusion follows without regard to the true undisclosed intention of those espousing the plan.
I next consider plaintiff's contention that the amount contributed to the trustees of Century's Profit Sharing Trust for the fiscal year ended August 31, 1956, was improperly calculated under the plan.
The facts surrounding this contention may be summarized in short order. When Century sold its stock in D. C. A., it treated its loss as an operating loss deduction in arriving at its taxable income on its federal income tax return for the fiscal year involved. In connection with computing the contribution to the Profit Sharing Plan Trust for the same year the loss was not deducted from net profits in arriving at the amount to be contributed.
The Trust plan, which is to be construed under Delaware law, provides that:
"* * * for each year * * * the companies * * * shall contribute to the Trust thirty-three and one-third percent (331/3%) of their consolidated net profits for such year in excess of $125,000, exclusive of capital gains or losses, which amount shall not exceed fifteen percent (15%) of the compensation paid to Participants for such companies. * * *"
The plan goes on in the same article to provide that:
"The determination of independent auditors, designated from time to time by the Company, as to the amount of the Company's net profits for the purposes of this Article shall be conclusive."
Mr. Kaufman of David B. Jacobs & Co., which has been Century's auditor for many years, made the determination that the loss on the sale of D. C. A. stock should not be deducted for purposes of determining net profits under the plan.
Plaintiff contends that the Kaufman determination should not be conclusive because the Jacobs firm was not in fact an independent auditor. Defendants dispute this contention.
Even if the court were to agree with plaintiff that the Jacobs firm was not an independent auditor it would still be necessary to have the matter resolved in some way because the beneficiaries of the plan *806 are entitled to a determination. Consequently, I shall decide the propriety of the determination by the Jacobs firm without ruling on the question as to whether it was acting as an independent auditor.
There was evidence surrounding the drafting of the agreement which tended to show quite strongly that the plan was not necessarily intended to include losses of the type here involved even though they might be properly deducted for federal tax purposes. Under the draft of the plan first submitted it was provided that "Net profits shall mean the profits of the Company each year as determined for Federal income tax purposes * * *". And, it was also provided that the net profits were to be exclusive of capital gains. The words "for Federal income tax purposes" were deleted and the language leaving the determination to independent auditors added. The words "or losses" were added after the words "capital gains". This background tends to show that it was not intended that the treatment of net profits under the plan would necessarily be the same as the treatment of that factor for federal tax purposes.
The provision of the final agreement leaving the ultimate decision to independent auditors tends to show an intention that the determination was to be in accordance with generally accepted accounting principles.
There was testimony of expert witnesses on behalf of defendants tending to show that the exclusion of the D. C. A. loss in computing net income under the plan was in accordance with sound accounting principles. The testimony of plaintiff's expert was not persuasive. He seemed to suggest that capital gains would be excluded but capital losses would have to be viewed as ordinary losses for purposes of the plan. I appreciate that the investment in D. C. A. was to obtain product, namely, films, but it does not seem to me that this loss was of a character which was intended to be encompassed within the term "net profits" as that term is employed in the plan. I say this because the plan was intended to provide an incentive to the employees to produce larger profits. Normally one might expect these profits to arise from the operation of the business and not from capital gains and losses over which such employees have little if any control.
Since the court is concerned with an interpretation of the Profit Sharing Plan, it is not of conclusive importance that this item may be accorded a different treatment under decisions applicable to the Internal Revenue Act.
I therefore conclude that whether or not the Jacobs firm made its determination as an independent auditor, its determination to exclude the loss from the sale of D. C. A. stock in computing net income under the plan was proper. It follows that plaintiff's attack on the treatment of D. C. A.'s loss is without merit.
We come next to plaintiff's contention that Century caused a loss to itself during 1957 by selling some of its 8% debenture bonds to the Profit Sharing Trust.
Century sold the trustees $83,600 principal face amount of its 8% debenture bonds for $75,441.80, being the price paid for them by Century when it purchased them from the public. At the time Century had current assets of about $2,200,000 and current liabilities of about $1,100,000. The bonds had been purchased by Century at a discount in the period between December 1954 and August 1955 in conjunction with its purchase of its common stock.
It appears that the sale was not pursuant to board action and that the officials of Century who authorized the sale to the trust fund were beneficiaries thereof. I shall therefore assume that those seeking to sustain the transaction have the burden of establishing the propriety of the sale.
*807 The parties are in dispute as to whether plaintiff himself initiated or approved the transaction he now attacks. I am not satisfied from the conflicting evidence that plaintiff did authorize or approve the particular sale of Century's bonds to the trust fund.
Admittedly the debentures were sold to the trust at their cost to Century. The fact that Century shortly thereafter created a drive-in theatre and that such a project receives less favorable financing terms cannot justify the present transaction. First off, I do not believe that Century needed the $75,000 so badly that it could not have obtained it on more favorable terms than were obtained by selling the debentures at a discount. The decision to sell did not even have the cloak of an objective judgment by a disinterested board.
Can the sale be justified? Plaintiff says that it cannot because it resulted in an increase of Century's debenture obligation without reason solely for the benefit of the trust fund and thus for the benefit of those who (among others) caused the sale to be made. Defendants say that, in any event, they were sold for their fair value and thus there was no damage to Century. I hardly think this is a complete answer since Century was reestablishing its liability under the bonds without reason from its point of view. Moreover, of vital importance, it was passing along to the trust fund the benefit of its purchases at a discount.
I therefore conclude that the responsible defendants are liable for the discount benefit obtained for the trust from the sale. This amount is fixed by plaintiff at $7,158.20 and I shall accept that figure.
Since plaintiff only requests a monetary judgment I need not decide whether the president had the power to sell the debentures with or without board action, and whether other relief would be proper.
I turn now to the claims by plaintiff and by defendants in connection with the salary agreement made when plaintiff severed his connection with Century.
Defendants seek to be relieved from paying the balance due under the agreement, and indeed seek to recoup some of the payments made. They say that plaintiff, contrary to his agreement, has not conducted himself in relation to Century with the good faith, discretion, reliability and trustworthiness appropriate to the proper performance of his duties. Both parties tacitly concede that New York law controls since the agreement was made there.
Plaintiff concedes the duty alleged by defendants but denies its violation. Plaintiff's alleged violations fall into three categories.
Defendants say that plaintiff (after retiring as president) gave Century's lawyers one version of events in connection with a suit against Century's subsidiaries by some third party. They say that after having associated with the third party in some business transaction the plaintiff, during the taking of his deposition, then changed his version of what happened. I have examined the record carefully on this point and I find that while there is some variance in plaintiff's versions, it is not sufficiently substantial to justify the conclusion that plaintiff altered his version of events out of evil motives. Many of the matters are so equivocal that it would seem to be unduly harsh to justify a termination of plaintiff's salary. After all, plaintiff still had a substantial interest, direct and indirect, in the future of Century.
Defendants also claim that plaintiff violated his duty of loyalty to the corporation by making disparaging remarks against its officers and directors.
Certainly plaintiff is not viewed as a mere employee of Century. He was a substantial stockholder and a co-trustee of a number of its shares. Thus, he had *808 certain rights as stockholder to examine the corporate affairs and to make remarks of a type which would be improper for a mere employee to make. Moreover, many of the remarks relied upon by defendants were uttered, to defendants' knowledge, prior to their agreeing to pay plaintiff the salary involved. Certainly defendants cannot now rely upon such remarks.
Finally, defendants say that by filing this action the plaintiff forfeited his right to compensation after that date. Plaintiff would have had no standing as a mere employee to maintain this action. This action was filed by plaintiff as a substantial stockholder. While many of his charges have been ruled groundless, they are not all in that category. Moreover, I do not believe from the evidence that the action was so frivolous as to warrant the inference that it was filed in bad faith.
I am confident that the corporation's arrangement with plaintiff, while expressed in terms of availability for future advice, was nothing more nor less than additional severance pay. I find as a fact that defendants had no intention of calling upon plaintiff. Thus, it is a sheer mockery here to say that by his actions plaintiff has disabled himself from fulfilling the terms of the contract. While this factor cannot be conclusive as against the provisions of the agreement it is relevant where, as here, the plaintiff has asserted rights as a shareholder and where his assertions, though rejected in part, are not considered as having been filed in bad faith.
I therefore conclude that defendants are not entitled to recover any portion of the money paid plaintiff under the agreement executed in connection with the termination of his services as president of Century. On the contrary, I conclude that plaintiff is entitled to receive the unpaid balance due thereunder.
Present orders on notice.