ARTHUR HOFFMAN, ERWIN H. EZZES, HERMAN KOENIGSBERG and VIRGINIA S. HUDSON et al.,
Appellants,

*vs.*

SOL A. DANN et al. and MARY L. GALLO et al.,
Plaintiffs Below, Appellees,

and

CHRYSLER CORPORATION et al. and PAUL C. ACKERMAN et al.,
Defendants Below, Appellees.

*Supreme Court on Appeal, November 17, 1964.*

*Howard M. Handelman,* Wilmington, and *Norman Annenberg,* New York City, for appellant objector Ezzes.

*Frank J. Miller,* of Foulk, Walker, Miller & Wakefield, Wilmington, for appellant objector Koenigsberg.

*Irving Morris* and *J. A. Rosenthal,* of Cohen, Morris & Rosenthal, Wilmington, for appellant objector Judson et al.

*Sotiere S. Kapsalis,* Wilmington, and Bader & Bader, New York City, for appellant Hoffman.

*William E. Taylor, Jr.,* Wilmington, *Norman S. Nemser* and *Stanley Nemser,* and *Irving Steinman,* New York City, for plaintiffs appellees Mary L. Gallo and James A. Gallo.

*Daniel O. Hastings, Clarence W. Taylor* and *Russell J. Willard, Jr.,* of Hastings, Taylor & Willard, Wilmington, *Lewis M. Dabney, Jr.,* Liebman, Eulau & Robinson, New York City, and *Dann, Rosenbaum Bloom & Kaufman,* Detroit, Mich., for plaintiffs appellees in the Dann action except Sol A. Dann.

*Richard F. Corroon* of Berl, Potter & Anderson, *Daniel L. Herrmann,* of Herrmann, Bayard, Brill & Russell, *S. Samuel Arsht,* of Morris, Nichols, Arsht & Tunnell, *Robert H. Richards, Jr.,* of Richards, Layton & Finger, *John J. Morris, Jr.,* and *Albert W. James,* of Morris, James, Hitchens & Williams, and *Clyde M. England, Jr.,* Wilmington, *Francis S. Bensel* and *Robert Ehrenbard* of Kelley, Drye, Newhall, Maginnes & Warren, *David W. Peck* and *Howard T. Milman,* of Sullivan & Cromwell, and *Milton Pollack,* New York City, for certain defendant appellees.

*Sol A. Dann,* Detroit, Mich., plaintiff appellee, in pro. per.

WOLCOTT, C.J. and CAREY, J., and STIFTEL, Judge, sitting.

WOLCOTT, Chief Justice: These are appeals from a judgment of approval of the settlement of a stockholders' derivative action brought in behalf of Chrysler Corporation. The settlement approved disposed of two stockholders' derivative actions which had been consolidated for the purpose of settlement. In the two actions 17 separate causes of action, involving in all 70 separate claims, were asserted against 97 individual and corporate defendants.

The causes of action may be divided into three classifications: (1) charges that certain officers of Chrysler had personally profited from transactions between Chrysler and suppliers in which they had a financial interest; (2) charges that some of the defendants as officers and directors had mismanaged Chrysler from 1956 to 1961, and (3) charges that the Incentive Compensation Plan of Chrysler and its Stock Option Plans were not soundly devised, and were unfair to Chrysler's stockholders.

Prior to the agreement of settlement the plaintiffs had conducted fairly extensive discovery proceedings, and agreed to the terms of the settlement only on the condition that they be permitted further discovery in order to determine whether or not the claims asserted in the complaints had sufficient merit to demonstrate the unfairness of the proposed settlement. Additional discovery was allowed which thereafter proved to be elaborate. The final result was that plaintiffs concluded that, except for the cause of action based upon the unfairness of the Incentive Compensation Plan, no cause of action set forth in the complaints could be successfully prosecuted to recovery because of the lack of probative evidence.

Accordingly, plaintiffs represented to the stockholders in the notice calling a stockholders meeting to approve the proposed settlement that, with the exception of the cause of action based upon the Incentive Compensation Plan, there was no possibility of recovery in any substantial amount for the benefit of Chrysler and its stockholders.

Thereafter, the stockholders, at the special meeting called for the purpose, overwhelmingly approved the proposed settlement and a modification of the Incentive Compensation Plan which was part of the proposed settlement.

In addition, following the stockholders meeting the Chancellor appointed an *amicus curiae* to report to him on the relevant issues to be tendered at the hearing on the proposed settlement, and as to proof which would be of assistance to him in passing on the fairness of the settlement. The *amicus* filed an elaborate report with the Chancellor analyzing the evidence of record and suggesting other areas in which additional proof might be desirable.

Subsequently, an extensive hearing upon the fairness of the proposed settlement was held before the Chancellor. He ultimately approved the settlement. From his judgment of approval these appeals are taken by various objecting stockholders who had appeared at the hearing before the Chancellor to oppose the settlement.

Fundamentally, the settlement agreed upon by the parties and approved by the Chancellor provides that the actions herein be dis-

missed with prejudice and releases be delivered to the defendants, with the exception of the defendant Newberg, and, in return, that the Chrysler Incentive Compensation Plan be amended by stockholder action to accomplish what both plaintiffs and defendants say is a better Incentive Compensation Plan than that formerly in effect.

These appeals were taken only by certain stockholder objectors appearing at the hearing upon the settlement. None of the plaintiffs have appealed but appear in this Court as appellees along with the defendants. Only one of the objectors, viz., Ezzes, attacks the approval of the settlement on the ground that some of the causes of action asserted in the complaints are not in fact worthless but, to the contrary, offer hope of substantial recovery for the benefit of Chrysler.

We first consider the arguments made by the appellant Ezzes that certain of the causes of action offer hope of substantial recovery for the benefit of Chrysler. In doing so, however, we consider only those specific causes of action brought to our attention by Ezzes in his brief and at the argument.

First, Ezzes argues that the incentive compensation computations for the years 1955, 1957, 1960 and 1962 were made in violation of the Incentive Compensation Stockholders' Resolution of 1956. The argument is that nonoperating income was improperly included in consolidated net earnings of Chrysler for those years in order to compute the total amount payable as incentive compensation.

For the years in question the payment of incentive compensation was governed by the Stockholders' Resolution of 1956 authorizing the payment of incentive compensation not to exceed 5 % "of the consolidated net earnings for that fiscal year (as reported in the Annual Report to the stockholders)."

In the computations in question all income of Chrysler resulting from its automobile business as well as from its investments, interest on loans, and profits from other sources were included in consolidated net earnings for the purpose of computing incentive compensation. Ezzes argues that the phrase "consolidated net earnings" used in the Resolution of 1956 necessarily excluded earnings from any source not connected with its main business venture, i. e., the making and sale of

automobiles. It is argued that the improper inclusion of the so-called nonoperating income for the years in question resulted in an increase in incentive compensation of slightly over $2,000,000 which may readily be recovered from the defendants.

The Resolution of the Stockholders of 1956 does not exclude in terms so-called nonoperating income, but refers generally to "consolidated net earnings." Chrysler is actually a diversified business and has earnings arising from other than the manufacture and sale of automobiles. It has earnings derived from its Air-Temp, Missile, Defense and Space Divisions which are nonautomobile sources, and from some other diversified sources such as catering service, vending machines in its plants, etc.

If the stockholders intended to exclude income from sources other than the manufacture and sale of automobiles from the Incentive Compensation Plan, that should have been made specific in the Resolution authorizing such payments. This follows from the provision in the Resolution that incentive compensation was to be based on the Annual Report to stockholders, which included earnings from all sources as consolidated earnings.

Ezzes, however, cites in this connection three cases which he argues control the question.

He cites *Schwartz v. Miner*, 37 *Del.Ch.* 575, 146 *A.2d* 810. This case was a derivative action on behalf of a corporation which had a Profit-Sharing Trust Plan providing for contribution by the corporation of a percentage of its consolidated net profits. The corporation made an investment in the stock of a supplying company which it later sold at a loss. In determining later the amount to be distributed under the Profit-Sharing Plan, the loss thus occasioned was not deducted from the net profits. The Chancellor held that the corporation under the Plan was not required to deduct the net loss from the sale of capital assets in determining the amount to be distributed.

The case, however, does not stand for the proposition for which Ezzes cites it. The Plan involved in the Schwartz case provided for the contribution by the corporation to the Profit-Sharing Trust of a percentage of "consolidated net profits * * * exclusive of capital gains

or losses." We think the Chancellor approved the exclusion of the capital loss from the computation of consolidated net profits of the corporation by reason of the precise exclusion in the Plan, itself, and not upon any theory that consolidated net earnings of necessity must be exclusive of so-called nonoperating income.

Ezzes also cites *Lieberman v. Becker,* 38 *Del.Ch.* 540, 155 *A.2d* 596. We think, however, this case has nothing to do with the problem. It dealt with an attack upon a Deferred Compensation Unit Plan ultimately upheld by this Court. That Plan, however, was tied directly to the market price and dividends upon the corporation's stock. We see no connection between the rule announced in the Lieberman case and the cause of action now under consideration.

Finally, on this point, Ezzes cites *Heller v. Boylan, Sup.,* 29 *N.Y.S.2d* 653, *aff'd.* 263 *App.Div.* 815, 32 *N.Y.S.2d* 131. This case, we think, is equally inapposite to the one before us. In it the Court construed the term "net profits" used in a bylaw providing for the payment of incentive bonus. The bylaw in question defined "net profits" as the "net earnings made by the company in its business as a manufacturer and seller of tobacco and its products." The Court in Heller clearly reached its decision upon the conclusion that if non-tobacco earnings of the company had been intended to be included, the bylaw would have been worded differently.

Thus it is, we think, that with respect to this particular cause of action the contention of Ezzes that substantial recovery could be made on it is erroneous. To the contrary, we think no recovery could be obtained as a result of trial.

The next cause of action said by Ezzes to have the probability of ultimate substantial recovery is that in 1962 the sum of $884,000, made up of state and local taxes, was included in net earnings. It is argued that this was illegal because this item was not reported in the 1962 Annual Report to stockholders as required by the Resolution governing Incentive Compensation Plans.

The figure $884,000 is arrived at as the difference between $60,700,000 reported as "Taxes on Income" in the 1962 Annual

Report to Stockholders, and $61,584,000 included as "Taxes on Income" in the computing of incentive compensation for 1962.

It is therefore argued that since only those amounts reported in the Annual Report to stockholders could be included in the computation of incentive compensation, and since the $884,000 was not reported in the Annual Report, it was clearly improperly included in the incentive computation and the directors are accordingly liable.

Initially, it is to be observed that the sum of $884,000 included in the 1962 computation is in fact the total of state and local income taxes paid by Chrysler. Prior to 1942 these figures were included by Chrysler's accountants with Federal income taxes but, thereafter, were not so included because the amounts did not again become significant until 1962 after the decision in *Northwestern States Portland Cement Co. v. State of Minnesota*, 358 *U.S.* 450, 79 *S.Ct.* 357, 3 *L.Ed.2d* 421, upholding the right of states to levy income taxes on companies engaged in interstate commerce.

Following this decision, Chrysler's auditors sought the advice of counsel as to whether or not to take such taxes into account in computing incentive compensation. This action was taken in accordance with the 1956 Resolution which authorized the auditors in the computation of incentive compensation to rely upon the opinion of counsel as to any matter of law.

The question therefore as to the propriety of including $884,000 in the computation of incentive compensation for the year 1962 depends solely on whether or not these figures were contained in the Annual Report to stockholders for that year. As a matter of fact, the Annual Report to stockholders of 1962 does in fact contain the figures making up this sum, although they are included under different headings in the Annual Report. We are accordingly of the opinion that the Chancellor was correct in holding as he did that this asserted cause of action had no probability of substantial recovery.

Next, Ezzes argues that the cause of action based upon an alleged violation of the 1929 Incentive Compensation Resolution of Stockholders for the years 1953 and 1955 has substantial probability of recovery.

The 1929 Resolution of Stockholders providing for incentive compensation, later superseded by the 1956 Resolution, provided that incentive compensation may be paid not in excess of 5% "of the net earnings of the corporation for that year." It is argued, citing *Heller v. Boylan*, supra, that the clear and unambiguous terms of this Resolution prevented the payment of incentive compensation for the years in question out of "consolidated earnings" of the corporation, but that this in fact was done in 1953 and 1955.

However, from 1929 on, the earnings of the corporation were always reported to stockholders as consolidated earnings. We think this continued practice clearly indicates that the intention of all concerned was that the 1929 Resolution referring to "net earnings" in fact meant "consolidated net earnings." Under the circumstances, it is proper to define the phrase "net earnings" as "consolidated net earnings." *Meyers v. Cowdin, Sup.*, 47 N.Y.S.2d 471, *aff'd.* 270 *App.Div.* 827, 60 *N.Y.S.2d* 129, *aff'd.* 296 *N.Y.* 755, 70 *N.E.2d* 555, and *Diamond v. Davis, Sup.*, 62 *N.Y.S.2d* 181.

We think this cause of action is at best of doubtful merit.

■ Ezzes next argues that the cause of action charging invalidity of stock options issued after 1956 in violation of the 1956 Incentive Compensation Resolution is meritorious and has promise of substantial recovery against the defendants on behalf of the corporation.

The argument in this respect is that since the Stockholders' Resolution of 1956 limited all Incentive Plans to 5% of consolidated net earnings, necessarily no stock options could have been issued if the full 5% had been paid out as incentive compensation. It is argued that the granting of stock options falls within the meaning of the words "Incentive Plans" as used in the Stockholders' Resolution of 1956.

Without laboring the issue, however, we are of the opinion that the limitation of a percentage of consolidated net earnings under the Stockholders' Resolution of 1956 has no bearing on the issuance of stock options. This is made clear by a comparison of the Stockholders' Resolution of 1929 with that of 1956. The 1929 Resolution authorized the Board to establish Profit-Sharing Plans and to provide for Bonus

Plans. In 1956 the 1929 Resolution was amended to permit the Board to provide plans for officers and executives of the corporation "to share in the profits of the corporation (hereinafter in this Resolution called Incentive Plans)." It seems plain therefore that the 1956 Resolution substituted the phrase "Incentive Plans" for the former phrases of "Profit-Sharing Plans" and "Bonus Plans." This being so, it is apparent that the amendment was not intended to include Stock Option Plans which, ordinarily at least, are not Profit-Sharing or Bonus Plans but are plans designed to permit the optionees an opportunity to acquire a share in the corporation, itself.

Furthermore, the Stock Option Plan of the corporation was approved by the stockholders in 1952 and had at that time no relation to the Incentive Plan of 1929, nor did it acquire any by the subsequent amendment of that Plan in 1956.

Accordingly, we are of the opinion that this cause of action is without merit.

Next, Ezzes argues that the cause of action charging the directors with the wasting of corporate assets by causing the stockholders to cancel stock options previously granted and granting new options at a lower option price is meritorious and has the probability of substantial recovery.

In 1958 the Stock Option Committee of non-eligible directors granted, subject to stockholder approval, new options to purchase stock at around $50 per share on condition the holders of options previously issued at $61 to $77 per share were surrendered for cancellation. The Board recommended the proposal to the stockholders. It is argued that this action constitutes a waste of corporate assets.

It appears to us that the provisions of the Plan authorizing the issuance of options in 1959 comply with the requirements laid down by Delaware Law for the validity of Stock Option Plans. Indeed, no serious contention is made to the contrary.

The argument of Ezzes under this heading seems to be that a corporation should not permit the cancellation of old options and the issuance of new stock options at lower prices since that, in effect,

excuses poor performance by management. Certain magazine and Law Review articles are cited to this effect and, indeed, we may assume that, as an ordinary business practice, such action is undesirable. This does not alter the fact, however, that under the law of this State a Stock Option Plan may not be successfully attacked when the options are granted by a disinterested committee with the approval of the directors and stockholders, and where the optionee is required to remain in the employ of the corporation. *Gottlieb v. Heyden Chemical Corp.*, 33 *Del.Ch.* 177, 91 *A.2d* 57; *Beard v. Elster*, 39 *Del.Ch.* 153, 160 *A.2d* 731. The new Option Plan meets these tests.

We are of the opinion that this cause of action has no merit.

■ Finally, Ezzes argues that the cause of action based upon the cost to Chrysler of a revolving credit commitment is meritorious and has probable recovery of in excess of $2,000,000.

The facts underlying this alleged cause of action are that in 1958 Chrysler obtained a revolving credit commitment for $150,000,000 which was continued until 1961. Chrysler never used the revolving credit but its existence cost Chrysler $2,157,533 from 1959 to 1961.

The credit commitment was recommended by the Finance Committee in 1958 of which there were nine members, seven of whom were directors of banks later participating in the credit commitment. Prior to this action Chrysler's Administrative Committee, the members of which were all full-time employees of Chrysler, approved the establishment of the credit commitment. On the same day, the Board of Directors—18 of the total of 21 being present—approved the credit commitment arrangement. Of the 18 directors voting, eight were officers or directors of banks later participating in the revolving credit commitment.

Ezzes argues that the action of the Finance Committee and the Board of Directors was illegal as a violation of Article II, Section 6 of Chrysler's bylaws requiring a majority of directors in office to constitute a quorum, and Article II, Section 9 providing that no director shall vote upon a matter in which he is interested.

It appears that the reasons leading to the arrangement of the revolving credit commitment are that in 1958 it was clear to the directors that Chrysler faced heavy cash demands due to the requirements to be caused by major model changes in 1959 and 1961 ; the entry into the compact car field; increased emphasis on international operations and a slowdown in Government payments for defense products, all of which would probably require additional cash. In addition, in 1958 it had become obvious that Chrysler's financial fortunes had begun to deteriorate and that its sales were severely contracting.

Accordingly, on the basis of this estimate of Chrysler's prospects the revolving credit arrangement was approved. The agreement was between Chrysler and the Hanover Bank as agent, of which McNeill, one of Chrysler's directors, was president. However, it appears that the Hanover Bank had been selected by two independent officers of Chrysler as agent, and that it had agreed to serve without compensation.

Furthermore, at the time the revolving credit agreement was authorized, no bank other than the Hanover Bank had been selected as a participant in the agreement. As a matter of fact, Simons, Chrysler's treasurer, selected the banks to participate, allocated their shares of the participation, and later reported that fact to the directors.

Thereafter, from 1958 to 1961 the advisability of terminating the credit agreement was reviewed frequently and, in the unanimous opinion of the Board of Directors until 1961, it was continued as advisable for the good interests of Chrysler.

The Chancellor found that the evidence of record discharged the burden of proof lodged upon the directors of proving that the commitment was reasonably necessary as a matter of business judgment for the purpose it was intended to serve, and that, accordingly, the technical bylaw violation, if indeed there was one, imposed no liability upon the directors since there was no showing at all of any loss to Chrysler or of any pecuniary benefit to the allegedly interested directors.

We agree with the Chancellor that this cause of action is essentially an attack upon a decision involving the exercise of business judgment on the part of the directors. In the absence of a showing of

bad faith or fraud, of which there is none in this record, recovery on this claim is at best of extremely doubtful probability. *Keenan v. Eshleman*, 23 *Del.Ch.* 234, 2 *A.2d* 904, 120 *A.L.R.* 227; *Gottlieb v. Heyden Chemical Corp.*, 33 *Del.Ch.* 82, 90 *A.2d* 660; *Sterling v. Mayflower Hotel Corp.*, 33 *Del.Ch.* 293, 93 *A.2d* 107, 38 *A.L.R.2d* 425.

■ There were other causes of action argued by Ezzes to the Chancellor below, all of which were held by the Chancellor to be of extremely doubtful merit. Ezzes has not in this Court renewed his argument with respect to these other causes of action. We therefore are not required to consider them.

With respect to the causes of action urged upon us as containing probability of substantial recovery and, thus, a reason for disapproval of the settlement, we agree with the appraisal of them made by the Chancellor to the effect that the evidence produced in the record in support of these claims is wholly inadequate to afford any hope of substantial recovery upon them. Therefore, they may properly be described as devoid of merit or, possibly as some of the parties label them, worthless.

Of all of the claims asserted against these defendants, the only one considered to have any possibility of ultimate recovery was the one based upon the alleged unfairness of the 1956 Incentive Compensation Arrangement. All of the parties before us agree that this is the fact with the exception of the appellant Ezzes and the plaintiff-appellee Dann, whose position will be referred to later.

Under the 1956 Plan, incentive compensation awards were permitted to be made for years when the consolidated net earnings of Chrysler and its subsidiaries, computed before the payment of taxes on income and before the payment of incentive compensation and interest on long-term debt of the corporation, exceeded 7% of the shareholder's investment—that is, capital, surplus and retained earnings of Chrysler and its subsidiaries and the long-term debt of Chrysler. The total award for any one year was limited to 5% of such excess. There was no provision limiting the fund to be paid as incen-

tive compensation in any one year to the amount of dividends declared in that year.

The charge of unfairness with respect to the 1956 Plan is that it was wasteful in that it permitted the payment of more in the way of incentive compensation than do comparable Plans of Chrysler's competitors; that the Plan does not limit the payment of incentive compensation only to years when corporate income exceeds a reasonable return on the stockholder's investment, and that the Plan requires a so-called "set-aside" for the benefit of stockholders of only 7% of the stockholder's investment before taxes which, after the payment of taxes, is the equivalent of about $3\frac{1}{2}\%$. All of this means, it is argued, that the Plan is unfair because the stockholder's return on his investment is too small in comparison with the incentive compensation permitted to be paid.

The Chancellor concluded that the attack on the Plan as outlined above raised an issue of fairness upon comparison of the return on the stockholder's investment with the amount of incentive compensation thatcould be paid. He therefore concluded that an issue as to the fairness of the 1956 Plan remained in the case, even though his appraisal of the other causes of action in effect was that they were worthless.

Accordingly, the parties agreed upon a settlement as to the only remaining issue, that of fairness of the Plan. As a part of that settlement they proposed the adoption of a new Incentive Compensation Plan to be submitted to the stockholders for their approval upon the understanding that a vote for its approval was a vote in favor of the agreed-upon settlement. As we have pointed out, the stockholders overwhelmingly approved both the new Compensation Plan and the settlement.

The new Plan of 1963 briefly is as follows: The period within which it is to operate is 1963 through 1969. It provides that incentive compensation may be paid only when the consolidated net income after taxes, as reported in the Annual Report to stockholders, plus provision for incentive compensation plus interest on the long-term debt of the corporation, is greater than $5\frac{1}{2}\%$ of the stockholder's investment—that is, capital, surplus and retained earnings plus the

corporation's long-term debt. The total amount that may be awarded as incentive compensation is limited to the lower of 12% of the excess or the aggregate amount of all dividends paid upon the common stock for the year in question.

The adoption of the new Plan resulted in changing the Incentive Compensation Plan of Chrysler from a before-tax to an after-tax basis. It increased the after-tax set-aside from $3\frac{1}{2}\%$ under the old Plan to $5\frac{1}{2}\%$ under the new Plan, thus increasing the benefit to the stockholder's investment. The new Plan increases the percentage rate of incentive compensation computed after the increased set-aside for the benefit of stockholders. The result is that the Plan requires higher earnings before any award of incentive compensation may be made.

Until the earnings for a particular year reach the so-called "cross-over" point—that is, the amount of earnings which would make the fund for incentive compensation the same under both the old and new Plans—the result would be a smaller amount available under the new Plan to be awarded as incentive compensation. After the cross-over point is reached, however, a larger amount would be available for such purposes under the new Plan than would have been under the old. In addition, an increase in earnings in each succeeding year increases the amount of the set-aside so that higher earnings are required in each succeeding year to continue an increase in the amount awarded as incentive compensation.

It is obvious that the settlement with respect to the Compensation Plan has resulted in the increase of the set-aside for the benefit of stockholders before the payment of incentive compensation. This automatically increases the total amount of earnings required before incentive compensation can be paid.

The defendants argue it is really immaterial whether the change in the Compensation Plan is a benefit to Chrysler Corporation. They argue that the settlement should be approved for the reason that the necessity of defending the worthless claims asserted against the defendants would prove an expensive and unreasonable burden upon Chrysler Corporation by reason of the cost of the defense and the

wastage of time which would be required of Chrysler's officers and executives. Indeed, this seems to us to be an apparent fact.

The Chancellor concluded that his function was to determine whether or not the terms of the settlement are fair to Chrysler Corporation when set against the probability of recovery on the asserted claims against the other defendants. These are, of course, theoretically asserted for the benefit of Chrysler Corporation.

He concluded that while both the old Plan and the new Plan were probably fair and would be upheld against attack, he could not and should not determine which of the two was the better from the point of view of Chrysler. He pointed out that the new Plan does in fact require higher earnings, up to a certain point at least, in order for the same amount to be paid as incentive compensation as would have been permitted under the old Plan. Recognizing that no one could predict the future of Chrysler accurately, he reached the conclusion that in the long run the new Plan would probably result in increased benefits to the stockholders of Chrysler.

Accordingly, under all the circumstances, he approved the settlement subject to the limitation that no director of Chrysler should receive benefits under the Plan for the year 1963. This limitation was imposed because of the greatly increased earnings of Chrysler for the year 1963 which probably were known or could have been forecast by the Chrysler directors entitled to benefit under the Plan.

It is this determination of the Chancellor we are to review in these appeals. Our function in the review of such matters is not to determine for ourselves the intrinsic fairness of the settlement in the light of our business judgment. Our function is solely to determine whether or not the Chancellor in the approval of the settlement has abused his business judgment to an extent amounting to an abuse of judicial discretion. *Rome v. Archer*, 41 *Del.Ch.* 404, 197 *A.2d* 49; *Kleinman v. Saminsky*, 41 *Del.Ch.* 572, 200 *A.2d* 572.

Initially it is obvious that the settlement approved in this litigation does not take the traditional form of the payment of a *quid pro quo* by the defendants. The reason for this is obvious. Such a payment would be nothing more than a buying-off of the plaintiffs for the dis-

missal of worthless claims. It is, we think, generally conceded that such a practice is an undesirable one to ask a court to approve. In fact, *Rule* 23(c) of the *Court of Chancery, Del.C.Ann.* under which this settlement was approved was, we think, specifically designed to end a practice prevalent theretofore to this effect. See 3 *Moore's Federal Practice (2nd Ed.)*, ¶ 23.24[2].

Nevertheless, on the record before us the Chancellor concluded, and we agree with his conclusion, that the causes of action, with one possible exception, were, if not worthless, at least incapable of sufficient proof to hold out much hope of recovery. With respect to the one cause of action about which there could be some argument, the parties have agreed upon, and the Chrysler stockholders have approved, an adjustment which probably will result in a long-term benefit to Chrysler.

Accordingly, we think it was proper for the Chancellor to conclude, in view of the desirability of terminating litigation which, at best, was an harassment of Chrysler, to approve a settlement which departs from the traditional form. Each case, of necessity, must be decided upon its peculiar facts. Under the peculiar facts of this case this settlement is fair and results in the ending of this prolonged and harassing litigation. We think it should be approved.

The appellant Koenigsberg, an objector, argues that the settlement should be disapproved because in effect the stockholders, themselves, are making the payment of settlement through the media of increased incentive compensation payments. We think the argument confuses the facts of the result. Certainly, it is to the benefit of Chrysler stockholders to end this litigation. There is no hope of substantial recovery for their benefit by the continuance of the litigation, but there is assurance of cost to them in the event it is prolonged. Furthermore, it is at least arguable that the new Incentive Compensation Plan in the long run will benefit the stockholders of Chrysler by reason of the increased requirements of the so-called set-aside.

It seems to us to make little difference under the circumstances of this litigation that the individual defendants who receive releases as a part of this settlement have in fact made no monetary payment in

settlement. This, we think, necessarily follows from the fact that the claims asserted against the individual defendants have been found to be devoid of merit. Despite this, they cannot end the litigation. The claims are pleaded with technically legal sufficiency and, thus, are not subject to a motion to dismiss.

Nevertheless, if the claims are prosecuted the expense of defense will fall upon Chrysler Corporation which, in the last analysis, is the Chrysler stockholders. We think, therefore, that while on its face plausible, the argument of Koenigsberg is not sufficient to cause us to interfere with the exercise of the discretion of the Chancellor.

The appellants, Sandler objectors, argue that the settlement should be disapproved because it confers no benefit upon Chrysler and because, for the year 1963, the amount which may be awarded as incentive compensation under the new Plan is some $1,500,000 in excess of that which could have been awarded under the old Plan. The argument is, of course, primarily based upon the fortuitous circumstance that Chrysler's earnings for 1963 were greatly larger than for 1962. While the directors and officers of Chrysler may have realized the potentially greater earnings for that year, that fact has been taken care of by the Chancellor in the condition he imposed upon his approval of the settlement, that such persons not share in the incentive compensation award for 1963.

A further answer to these objectors' argument is that, in all probability, over the long span of the future, the Plan in its operation will result in benefit to Chrysler's stockholders. Admittedly, no one can predict Chrysler's future earnings but, certainly, in a business such as the automobile industry, profits take their ups and downs and may well equalize themselves over a course of years.

The objector Ezzes makes a final point to the effect that approval of the 1963 Incentive Compensation Plan by the directors and stockholders was invalidly obtained.

He points out that of the directors present at the meetings of February 7, 1963 and March 21, 1963, which resulted in the recommendation of the Plan to the stockholders, all but two on February 7, and all but four on March 21, were either recipients of incen-

tive compensation or defendants in these actions, or both. Upon this fact, it is argued that the Board's action in approving the settlement, including the amendment to the Plan, was invalid as a violation of Article II, Section 6 of Chrysler's bylaws requiring a majority of directors in office to constitute a quorum, and as a violation of Article II, Section 9 of the bylaws providing that no director shall vote upon a matter in which he is interested, or be present when the vote is taken.

Ezzes overlooks the fact that the action of the directors did not bind Chrysler to the amendment in the Compensation Plan since, under the then-existing Plan, the sole method of change was by stockholder action. The most the directors could do in this respect was to submit to the stockholders the proposed change. This is what was done. Whether or not, therefore, there was some legal defect in the directors' action, that defect could be cured by informed stockholder action. *Kerbs v. California Eastern Airlines,* 33 *Del.Ch.* 69, 90 *A.2d* 652, 34 *A.L.R.2d* 839.

Ezzes says, however, that there was no effective stockholder action because a fair disclosure of the facts was not made to the stockholders in that they were not informed of the future profit potentials of Chrysler and the resulting possibility of payment of greatly increased incentive compensation under the amended Plan. He charges that before April 16, 1963, the date of the stockholders meeting, the directors knew that the new Plan would produce a substantially greater fund for incentive compensation for 1963 than would the old Plan; that there had been general public acceptance of Chrysler's 1963 model; that sales and earnings figures pointed to an outstanding year for Chrysler, and that general conditions known to the automobile industry indicated that the industry would have an outstanding year in 1963. The failure to include this information in the proxy material and the notice of settlement hearing, it is asserted, constituted a breach by the directors of their duty to make a full and frank disclosure to stockholders.

It appears, however, that these matters were largely disclosed to the stockholders in the Annual Report for 1962 which was sent to them at or prior to the starting of solicitation of proxies. Indeed, it

would seem as though a large part of the information Ezzes says was withheld was a matter of general public knowledge.

In any event, we are satisfied that the stockholders were fully informed and acted in the light of that information except, possibly, with respect to the charge that the directors knew that the new Plan would produce substantially greater compensation for 1963 than would the old Plan. The Chancellor, however, imposed as a condition upon his approval of the settlement the requirement that no director-defendant shall receive greater benefits under the Plan in 1963. We think this condition adequately takes care of Ezzes' objection.

All of the plaintiffs, with the exception of the plaintiff Dann, named as appellees in these proceedings, argue for the approval of the settlement. They advance two reasons in support of their position, one of which we have followed for our approval of the settlement. Their second reason is that the main benefit of the litigation now settled was to effect a change in management in Chrysler Corporation which has resulted in its greatly improved financial position.

We are of the opinion that the second reason, if it is entitled to any consideration—a question upon which we refuse to express an opinion—is entitled to consideration only in connection with the application for fees, as to which the Chancellor has reserved decision.

Finally, the plaintiff Dann, an appellee before us, has filed a brief and was permitted to argue orally in opposition to the approval of the settlement.

Some of the other appellees filed a motion to strike the brief of Dann on the ground that he had no standing before us to argue in opposition to the Chancellor's judgment since he had not taken an appeal therefrom. We think the position taken by these appellees is correct and that the plaintiff Dann, appellee here, has no standing to argue in opposition to the judgment below. Cf. *Cleaver v. Roberts, Del.,* 203 *A.2d* 63; *Trans World Airlines, Inc. v. State ex rel. Por-*

*terie, Del.,* 183 *A.2d* 174; *Casey v. Southern Corp.,* 26 *Del.Ch.* 447, 29 *A.2d* 174. The brief of the appellee, Sol A. Dann, is accordingly ordered struck from the record.

By reason of all of the foregoing, the judgment of the Chancellor approving the settlement of this litigation is hereby affirmed.